UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

Case No. 8:09-bk-25993-MGW

Chapter 7

IN RE:                                    :
                                          :
Kurt V. Bierek,                           :
                                          :
                      Debtor.             :
_____           :

### AGREED MOTION BY FLAGSTAR BANK, FSB
### FOR RELIEF FROM STAY AND ABANDONMENT
### RE: 6796 Summerbreeze Drive, Caledonia, Michigan  49316
### (Property To Be Surrendered)

Comes Now, FLAGSTAR BANK, FSB, by and through its undersigned

attorneys, moves the Court for an Order Granting Relief of Automatic Stay and in

support thereof would show:

1.      That Debtor filed a Chapter 7 petition in bankruptcy in the United States

Bankruptcy Court for the Middle District of Florida on November 13, 2009.

2.      This is a motion pursuant to Bankruptcy Rule 4001(a) for a modification

of the automatic stay provisions of Section 362(d)(1) of the Bankruptcy Code.

3.      That FLAGSTAR BANK, FSB, is a secured creditor by virtue of a

promissory note and mortgage on real property.  Said real property has the following

legal description: Township of Gaines, County of Kent and State of Michigan: Lot 5, The

Homes of Summerwind, According To The Recorded Plat Thereof In Liber 103 of Plats

on Page 34. Commonly Known as: 6796 Summerbreeze Drive, Caledonia, Michigan

49316.  The note and mortgage are attached hereto as Exhibit "A".

4.      That payments due pursuant to the aforementioned note and mortgage have been in default, and remain in default since October 1, 2009.

5.      That the aforementioned documents give the secured creditor, FLAGSTAR BANK, FSB, a first mortgage position on the property known as: 6796 Summerbreeze Drive, Caledonia, Michigan  49316.

6.      That Debtors are indebted to the secured creditor in the amount of $166,642.55 as set forth in FLAGSTAR BANK, FSB's Affidavit of Indebtedness which is attached to this motion as Exhibit "B".

7.      The Kent County, Michigan Property Appraiser shows a just market value of the property at $100,100.00.  A copy of the appraisal is attached hereto and made a part hereof as Exhibit "C".

8.      That the Debtors failed to adequately protect the interest of the secured creditor.

9.      That there is no equity in the property.

10.     Movant has conferred with counsel for the Debtors and has obtained a consent to the filing of this Motion.  A copy of the Consent to Motion for Relief From Stay is attached hereto and made a part hereof as Exhibit "D".

11.     Movant has incurred attorney's fees in the amount of $550.00 as a result of the necessity of filing this Motion.  Said attorney's fees and costs may be recoverable pursuant to state law and the mortgage documents.

12.     That FLAGSTAR BANK, FSB, is prohibited from instituting and/or completing a foreclosure action in the State Court because of the pendency of this Bankruptcy motion, and that in the absence of the court's Order allowing the secured

creditor, FLAGSTAR BANK, FSB, to proceed with the Foreclosure action, the secured

creditor's security will be significantly jeopardized.

     13.    Pursuant to M.D. Fla. L.B.R. 9004-2(1) the estimated time required for

hearing is five (5) minutes, if required.

     14.    A copy of the proposed Agreed Order Granting Flagstar Bank FSB's

Motion for Relief From Stay and Abandonment Re: 6796 Summerbreeze Drive,

Caledonia, Michigan  49316 is attached as Exhibit "E".

     WHEREFORE, FLAGSTAR BANK, FSB, moves this Honorable Court for an

Order Granting Relief from the Automatic Stay.

## <u>CERTIFICATE OF SERVICE</u>

     I HEREBY CERTIFY that a true and correct copy of the foregoing Agreed
Motion By Flagstar Bank For Relief From Stay And Abandonment Re: 6796
Summerbreeze Drive, Caledonia, Michigan  49316, proposed Agreed Order Granting
Flagstar Bank, FSB's Motion For Relief From Stay And Abandonment, copy of the
Affidavit of Indebtedness, copy of the Appraisal, copy of the Consent to Motion for
Relief From Stay, and copies of the Note and Mortgage have been served by either
CM/ECF transmission or standard first class U.S. Mail on this 26th day of January, 2010
to the following:

Kurt V. Bierek, 226 82nd Avenue North, St. Petersburg, FL  33702

Summer Preston, Law Office of Summer Preston, P.A., 2203 N. Lois Avenue, Suite 952,
Tampa, FL   33607

Connie J. Delisser, Esquire, The Law Office of Marshall C. Watson, P.A., 1800
Northwest 49th Street, Suite 120, Fort Lauderdale, FL  33309

Fifth Third Bank, P. O. Box 829009, Dallas, TX  75382-9009

HSBC Bank Nevada, N.A., Bass & Associates, P.C., 3936 E. Ft. Lowell Road, Suite
#200, Tucson, AZ   85712

Stephen L. Meininger, 707 North Franklin Street, Suite 850, Tampa, FL  33602

United States Trustee – TPA7, Timberlake Annex, Suite 1200, 501 E. Polk Street,
Tampa, FL  33602

Dated: January 26, 2010

Respectfully submitted,


By: /s/  Lawrence M. Weisberg
Lawrence M. Weisberg, Esquire
Florida Bar No. 962198
Counsel for Flagstar Bank, FSB
Greenfield & Coomber, P.A.
7000 W. Palmetto Park Road, Suite 402
Boca Raton, Florida   33433
Telephone: (561) 362-7355
Facsimile: (561) 828-5858
E-mail: bankruptcy@lmwlegal.com





20060331-0037081     03/31/2006
P:1 of 14    F:$53.00    3:06PM
Mary Hollinrake    T20060007010
Kent County MI Register    SEAL

# MORGAGE

After Recording Return To:
FLAGSTAR BANK
5151 CORPORATE DRIVE
TROY, MI 48098
FINAL DOCUMENTS, MAIL STOP W-530-3

This instrument was prepared by:
ADMIRAL LENDING
6095 28TH STREET
GRAND RAPIDS, MI 49546

V2 WBCD LOAN # ████1001

——————————————— [Space Above This Line For Recording Data] ———————————————

MIN ████████0143

DEFINITIONS
Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.
(A) "Security Instrument" means this document, which is dated  DECEMBER 30, 2005,    together with all Riders to this document.
(B) "Borrower" is ~~Kurt Bierek, Trustee, Trustee or Successor Trustee~~

*Kurt Bierek, a single man*

Borrower's address is 579 SHOREHAM CT NE
    SAINT PETERSBURG, FL 33716.

Borrower is the mortgagor under this Security Instrument.
(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
(D) "Lender" is ADMIRAL LENDING, LLC.

Lender is a LLC,                            organized and existing under the laws of
MICHIGAN.                               Lender's address is 2180 44TH ST SE, 203,
GRAND RAPIDS, MI  49508.  .

(E) "Note" means the promissory note signed by Borrower and dated  DECEMBER 30, 2005.    The Note states that Borrower owes Lender **********************ONE HUNDRED SEVENTY TWO THOUSAND AND NO/100 ************************************************** Dollars (U.S.  $172,000.00    ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than JANUARY 1, 2036.
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

MICHIGAN–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3023 1/01    Initials: _____
© 1999-2004 Online Documents, Inc.    Page 1 of 9                   MIEDEED  0402
                                                                    12-30-2005 13:27

REC'D MAR 13 2006    REC'D _____    *Exh. "A"*

V2 WBCD LOAN # ████1001

(G) "**Loan**" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H) "**Riders**" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

- [X] Adjustable Rate Rider
- [ ] Balloon Rider
- [ ] 1-4 Family Rider
- [ ] V.A. Rider
- [ ] Condominium Rider
- [ ] Planned Unit Development Rider
- [ ] Biweekly Payment Rider
- [X] Second Home Rider
- [ ] Other(s) [specify]

(I) "**Applicable Law**" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J) "**Community Association Dues, Fees, and Assessments**" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K) "**Electronic Funds Transfer**" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L) "**Escrow Items**" means those items that are described in Section 3.

(M) "**Miscellaneous Proceeds**" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N) "**Mortgage Insurance**" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O) "**Periodic Payment**" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) "**RESPA**" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "**Successor in Interest of Borrower**" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, warrant, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, with power of sale, the following described property located in the  COUNTY                                    [Type of Recording Jurisdiction] of
KENT                                       [Name of Recording Jurisdiction]:
SEE ATTACHED
APN #: 412204378024

which currently has the address of 6796 Summerbreeze Dr, CALEDONIA,

[Street] [City]

Michigan       49316          ("Property Address"):
              [Zip Code]

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

MICHIGAN--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3023 1/01
© 1999-2004 Online Documents, Inc.          Page 2 of 9



20050231-0037081          03/31/2005
P:2 of 16        P:459.00        3:08PM
Mary Hollinrake          T20060007210
Kent County MI Register          SEAL

V2 WBCD LOAN # ████████1001

' THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

MICHIGAN--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT  Form 3023 1/01
© 1999-2004 Online Documents, Inc.  Page 3 of 9

1/7

20060331-0037851  03/31/2006
P:9 of 14  F:$58.00  3:06PM
Mary Hollinrake  T20060007910
Kent County MI Register  SEAL

V2 WBCD LOAN # ████1001

it there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.  Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, and leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.  Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums

MICHIGAN--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3023 1/01
© 1999-2004 Online Documents, Inc.                      Page 4 of 9

200B0331-003708:          03/31/2005
P:4 of 14      F:583.00      3:06PM
Mary Hollinrake      12606007010
Kent County MI Register        SEAL

V2 WBCD LOAN # ███61001

paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and

V2 WBCD LOAN # ████1001

conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the note, another insurer, any reinsurer, any other entity, or affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provided that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage,

V2 WBCD LOAN # ████1001

grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected


20060331-0037681          03/31/2006
P.7 of 14      F:$63.00       3:06PM
Mary Hollinrake          T20060307310
Kent County RI Register       SEAL

V2 WBCD LOAN # ████1001

by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give notice of sale to Borrower in the manner provided in Section 15. Lender shall publish and post the notice of sale, and the Property shall be sold in the manner prescribed by Applicable Law. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

MICHIGAN--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3023 1/01
© 1999-2004 Online Documents, Inc.                Page 8 of 9



20069331-0037091            03/31/2006
Pg 8 of 14      :353.00         3:06PM
Mary Hollinrake     T20090007010
Kent County MI Register          SEAL

V2 WBCD LOAN #‌‌‌‌1001

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall prepare and file a discharge of this Security Instrument. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)
KURT BIEREK


State of MICHIGAN                    County of KENT

The foregoing instrument was acknowledged before me this 30ᵗʰ of Dec, 2005 (date)
by ~~XXXXXXXXXXX~~ Kurt Bierek, a single man

(name of person acknowledged).

*Teresa Wilson*
Signature of Person Taking Acknowledgment

*Closer*
Title or Rank

_____
Serial Number, if any


TERESA WILSON
NOTARY PUBLIC BARRY CO., MI
MY COMMISSION EXPIRES MAR. 16, 2012
ACTING IN  Kent  CO.

20060231-0037081           03/31/2006
P:9 of 14    F:153.00        3:06PM
Mary Hollincke          T2006000701D
Kent County MI Register       SEAL

TERESA WILSON
NOTARY PUBLIC BERRY CO., MI
MY COMMISSION EXPIRES MAR. 16, 2012
ACTING IN _____ CO.

Please return to:

TRIUNION TITLE
6095-28TH ST. SE STE 210
GRAND RAPIDS, MI 49546

TU-1792

20050331-0037081                    03/31/2006
P:10 of 14      F:$53.00           3:06PM
Mary Hollinrake              T20060007010
Kent County MI Register            SEAL

TOWNSHIP OF GAINES, COUNTY OF KENT AND STATE OF MICHIGAN:

LOT 5, THE HOMES OF SUMMERWIND, ACCORDING TO THE RECORDED PLAT THEREOF IN LIBER 103 OF PLATS ON PAGE 34.

COMMONLY KNOWN AS: 6796 SUMMERBREEZE DR SE
PP: 41-22-04-378-024

(6796 SUMMER TU1792.PFD/TU-1792/79)



20060331-0037061 03/31/2006
P:11 of 14 F:$53.00 3:06PM
Mary Hollinrake T200500D7018
Kent County MI Register SEAL

V2 WBCD LOAN # 601001
MIN: 0143

# FIXED/ADJUSTABLE RATE RIDER
### (LIBOR One-Year Index (As Published In The Wall Street Journal)-Rate Caps)

THIS FIXED/ADJUSTABLE RATE RIDER is made this 30TH day of
DECEMBER, 2005, and is incorporated into and shall be deemed to amend and
supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument")
of the same date given by the undersigned ("Borrower") to secure Borrower's Fixed/
Adjustable Rate Note (the "Note") to ADMIRAL LENDING, LLC, A MICHIGAN LLC

("Lender")
of the same date and covering the property described in the Security Instrument and
located at: 6796 Summerbreeze Dr
CALEDONIA, MI 49316.

**THE NOTE PROVIDES FOR A CHANGE IN BORROWER'S FIXED INTEREST
RATE TO AN ADJUSTABLE INTEREST RATE. THE NOTE LIMITS THE
AMOUNT BORROWER'S ADJUSTABLE INTEREST RATE CAN CHANGE AT
ANY ONE TIME AND THE MAXIMUM RATE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in
the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. ADJUSTABLE RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial fixed interest rate of 6.375%. The Note also
provides for a change in the initial fixed rate to an adjustable interest rate, as follows:

**4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES**
(A) Change Dates
The initial fixed interest rate I will pay will change to an adjustable interest rate on the
1ST day of JANUARY, 2011, and the adjustable interest rate I will pay may
change on that day every 12TH month thereafter. The date on which my initial
fixed interest rate changes to an adjustable interest rate, and each date on which my
adjustable interest rate could change, is called a "Change Date."
(B) The Index
Beginning with the first Change Date, my adjustable interest rate will be based on
an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-
denominated deposits in the London market ("LIBOR"), as published in **The Wall
Street Journal.** The most recent Index figure available as of the date 45 days before
each Change Date is called the "Current Index."
If the Index is no longer available, the Note Holder will choose a new index that is
based upon comparable information. The Note Holder will give me notice of this choice.
(C) Calculation of Changes
Before each Change Date, the Note Holder will calculate my new interest rate by
adding TWO AND ONE-HALF percentage point(s) ( 2.500% ) to the
Current Index. The Note Holder will then round the result of this addition to the nearest
one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D)
below, this rounded amount will be my new interest rate until the next Change Date.
The Note Holder will then determine the amount of the monthly payment that would
be sufficient to repay the unpaid principal that I am expected to owe at the Change Date
in full on the Maturity Date at my new interest rate in substantially equal payments. The
result of this calculation will be the new amount of my monthly payment.
(D) Limits on Interest Rate Changes
The interest rate I am required to pay at the first Change Date will not be greater than
8.375% or less than 4.375%. Thereafter, my adjustable interest rate will never
be increased or decreased on any single Change Date by more than
TWO percentage point(s) ( 2.000% ) from the rate
Initials:

MULTISTATE FIXED/ADJUSTABLE RATE RIDER-WSJ One-Year LIBOR-Single Family-Fannie Mae Uniform Instrument
Form 3187 6/01

20060331-0037081    03/31/2006
P:12 of 14    F:$68.00    3:06PM
Mary Hollinrake    720060007010
Kent County MI Register    SEAL

V2 WBCD LOAN # ██████1001

of interest I have been paying for the preceding  12     month(s). My interest rate will never be greater than    12.375%  which is called the "Maximum Rate."

**(E) Effective Date of Changes**
My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.
**(F) Notice of Changes**
The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**
1.  Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument shall read as follows:
    **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.
    If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.
    If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

2.  When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument described in Section B1 above shall then cease to be in effect, and the provisions of Uniform Covenant 18 of the Security Instrument shall be amended to read as follows:
    **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.
    If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

Initials:

MULTISTATE FIXED/ADJUSTABLE RATE RIDER-WSJ One-Year LIBOR-Single Family-Fannie Mae Uniform Instrument
Form 3187 6/01
© 2001-2002 Online Documents, Inc.              **Page 2 of 3**                        F3187RDU
                                                                   12-30-2005 13:27

20060331-0037081                03/31/2006
P:13 of 14    F:$63.00              3:26PM
Mary Hollinrake        T20060007010
Kent County MI Register           SERL

V2 WBCD LOAN #████1001

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____          12·30·05
KURT BIENER                                   Date

MULTISTATE FIXED/ADJUSTABLE RATE RIDER-WSJ One-Year LIBOR-Single Family-Fannie Mae Uniform Instrument
Form 3187 6/01
© 2001-2002 Online Documents, Inc.          Page 3 of 3                    F3187RDU
                                                              12-30-2005 13:27



V2 WBCD LOAN # ████1001

## SECOND HOME RIDER

MIN:███████████0143

THIS SECOND HOME RIDER is made this    30TH   day of DECEMBER, 2005    and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower," whether there are one or more persons undersigned) to secure Borrower's Note to  ADMIRAL LENDING, LLC, A MICHIGAN LLC

(the "Lender")
of the same date and covering the Property described in the Security Instrument (the "Property"), which is located at: 6796 Summerbreeze Dr, CALEDONIA, MI 49316.

In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree that Sections 6 and 8 of the Security Instrument are deleted and are replaced by the following:

**6. Occupancy.** Borrower shall occupy, and shall only use, the Property as Borrower's second home. Borrower shall keep the Property available for Borrower's exclusive use and enjoyment at all times, and shall not subject the Property to any timesharing or other shared ownership arrangement or to any rental pool or agreement that requires Borrower either to rent the Property or give a management firm or any other person any control over the occupancy or use of the Property.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's second home.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Second Home Rider.

_____(Seal)
KURT BIERER

MULTISTATE SECOND HOME RIDER–Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3890 1/01
© 1999-2004 Online Documents, Inc.                                   F3890RDU  0412
                                                                     12-30-2005 13:27

V2 WBCD LOAN #▓▓▓▓▓001
MIN:▓▓▓▓▓▓▓▓▓00143

# FIXED/ADJUSTABLE RATE NOTE
(LIBOR One-Year Index (As Published In The Wall Street Journal)-Rate Caps)

THIS NOTE PROVIDES FOR A CHANGE IN MY FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.

DECEMBER 30, 2005           Grand Rapids,                      MICHIGAN
[Date]                         [City]                          [State]

6796 Summerbreeze Dr, CALEDONIA, MI 49316
[Property Address]

## 1. BORROWER'S PROMISE TO PAY
In return for a loan that I have received, I promise to pay U.S.     $172,000.00     (this amount is called "Principal"), plus interest, to the order of Lender. Lender is ADMIRAL LENDING, LLC, A MICHIGAN LLC.

I will make all payments under this Note in the form of cash, check or money order.
I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST
Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of   6.375%.      The interest rate I will pay may change in accordance with Section 4 of this Note.
The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS
(A) Time and Place of Payments
I will pay principal and interest by making a payment every month.
I will make my monthly payments on the    1ST    day of each month beginning on  FEBRUARY 1, 2006.
I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on   JANUARY 1, 2036,      I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."
I will make my monthly payments at 2180 44TH ST SE
203
GRAND RAPIDS, MI  49508
or at a different place if required by the Note Holder.
(B) Amount of My Initial Monthly Payments
Each of my initial monthly payments will be in the amount of U.S.   $1,073.06.      This amount may change.
(C) Monthly Payment Changes
Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

## 4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES
(A) Change Dates
The initial fixed interest rate I will pay will change to an adjustable interest rate on the    1ST        day of JANUARY, 2011      and the adjustable interest rate I will pay may change on that day every    12TH      month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."
(B) The Index
Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."
If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.
(C) Calculation of Changes
Before each Change Date, the Note Holder will calculate my new interest rate by adding TWO AND ONE-HALF                        percentage point(s) (   2.500% ) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.
The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.
(D) Limits on Interest Rate Changes
The interest rate I am required to pay at the first Change Date will not be greater than  8.375%     or less than 4.375%.     Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than  TWO                        percentage point(s) (   2.000%  ) from the rate of interest I have been paying for the preceding     12      month(s). My interest rate will never be greater than  12.375%.

Initials: ___

 

V2 WBCD LOAN # ████████1001

**(E) Effective Date of Changes**
My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.
**(F) Notice of Changes**
The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

**(A) Late Charges for Overdue Payments**
If the Note Holder has not received the full amount of any monthly payment by the end of        15        calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be        5.000% of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**
If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**
If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**
Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**
If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

Initials:

MULTISTATE FIXED/ADJUSTABLE RATE NOTE-WSJ One-Year LIBOR-Single Family-Fannie Mae Uniform Instrument     Form 3528 6/01
© 2001-2003 Online Documents, Inc.     Page 2 of 3     F3528NOT 0307
12-30-2005 13:27



████████1001

5735 Sumatreana Dr Caledonia, MI 49316

V2 WBCD LOAN # 5059951001

(A) Until my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument shall read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

(B) When my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument described in 11(A) above shall then cease to be in effect, and Uniform Covenant 18 of the Security Instrument shall instead read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
KURT BIERER

PAY TO THE ORDER OF
Flagstar Bank, FSB

WITHOUT RECOURSE

ADMIRAL LENDING, LLC

By:_____
Emerita Nicolas
Team Leader

PAY TO THE ORDER OF
FLAGSTAR BANK, FSB
WITHOUT RECOURSE

ADMIRAL LENDING, LLC

BY:_____

PRINTED NAME:_____

ITS:_____

[Sign Original Only]

MULTISTATE FIXED/ADJUSTABLE RATE NOTE-WSJ One-Year LIBOR-Single Family-Fannie Mae Uniform Instrument       Form 3528 6/01
© 2001-2003 Online Documents, Inc.                    **Page 3 of 3**                    F3528NOT 0307
                                                                                         12-30-2005 13:27

 
1001

5755 Breezebreeze Dr Galesforts, MI 49316

Record and Return:
This instrument prepared by:
GREENFIELD & COOMBER, P.A.
7000 WEST PALMETTO PARK RD.
SUITE 402
BOCA RATON, FL 33433
LOAN#███████61001
MERS MIN#████████████80143

## ASSIGNMENT OF MORTGAGE

### KNOWN ALL MEN BY THESE PRESENTS:

That MERS as nominee ADMIRAL LENDING, LLC, a corporation, in consideration of the sum of Ten Dollars ($10.00) and other good and valuable considerations, received from or on behalf of FLAGSTAR BANK, FSB, party of the second part, at or before the ensealing and delivery of these presents, the receipt whereof is hereby acknowledged, does hereby grant, bargain, sell, assign, transfer and set over unto the said party of the second part a certain mortgage bearing date the December 30, 2005, in favor of Kurt Bierek, a single man, in Official Records Book 20060331-0037081, at Page(s) 1-14, of the public records of KENT County, Michigan, upon the following described piece or parcel of land, situate and being in said County and State, to-wit: Township of Gaines, County of Kent and State of Michigan: Lot 5, The Homes of Summerwind, According to the Recorded Plat Thereof in Liber 103 of Plats on Page 34. Commonly Known as: 6796 Summerbreeze Drive, S.E.

Together with the note(s) or obligation(s) described in said mortgage, and the moneys due and to become due thereon with the interest.

TO HAVE AND TO HOLD the same unto the said party of the second part, heirs, legal representatives, successors and assigns forever.

IN WITNESS WHEREOF, the party of the first party has caused these presents to be executed in its name, and its corporate seal to be hereunto affixed, by its proper officers thereunto duly authorized the ___24___ day of ___January___ _____, A.D. 2010

Signed, sealed and delivered
in our presence:

Print Name: _PATRICIA Woodruff_

Print Name: _Joshua S Sommapi_

MERS as nominee ADMIRAL
LENDING, LLC
_____, Vice President

CORPORATE SEAL

STATE OF _Michigan_
                              SS:
COUNTY OF _Oakland_

THE FOREGOING INSTRUMENT was acknowledged before me this __21__ day of January, 2010 by _Lindsay Anderson_, Vice President, MERS as nominee ADMIRAL LENDING, LLC. They are personally known to me or who have produced _____ _____ as identification and who did (did not) take an oath.

_____
Notary Public

My Commission Expires:

NELDA J. AMADOR
Notary Public, State of Michigan
County of Oakland
My Commission Expires 12/29/2012
Acting in the County of Oakland

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

Case No. 8:09-bk-25993-MGW

Chapter 7

IN RE:                                    :
                                          :
Kurt V. Bierek,                           :
                                          :
                 Debtor.                  :
                                          :
_____       :

### AFFIDAVIT OF INDEBTEDNESS

Affiant, Patricia D. Woodruff is (Job Title) _Bankruptcy_ , Flagstar Bank,
FSB in _Bankruptcy dept_ Bank Dept.) ("Flagstar") and is fully familiar with the
instant action and makes this affidavit on her own personal knowledge. She is Flagstar's
custodian of the business records concerning the transactions that were referred to in the
civil action to foreclose Flagstar's mortgage in State court. The records are kept in the
ordinary course of business and reflect events at or near the time of the entry into the
records.

According to those records, as of October 1, 2009, Flagstar was owed the
following sums on the $166,642.55 loan:

| | |
|---|---|
| Principal: | $163,925.63 |
| Interest through 12/31/09 | $ 2,600.62 |
| Assessed Fees | $ 9.00 |
| Total Late Fees Due | $ 107.30 |

To this amount would be added per diem amounts for the period after January 1,
2010. The per diem amount for the loan is $ _28.63_ based upon a contract rate
of 6.375% per annum.

$Exh. "B"$

Plaintiff has retained Lawrence Weisberg, Esquire from Greenfield & Coomber,

P.A. to prosecute this action and has agreed to pay the firm reasonable attorney fees.

END OF AFFIDAVIT

Patricia D. Woodruff

Sworn to and subscribed by Patricia D. Woodruff, for Flagstar Bank, FSB, before

me on this day of January  15 , 2010 and who is personally known to me or who has

produced identification.

(SEAL)

Notary Public

NELDA J. AMADOR
Notary Public, State of Michigan
County of Oakland
My Commission Expires 12/29/2015
Acting in the County of Oakland

2

## Parcel Summary

**Assessed values and taxable values displayed on accessKent are compiled from local city and township assessors and are current as of March, 2009. Changes after this date should be verified with local assessors. Additional property information may also be available from local assessors. Click here for a list of local government web sites. Some property addresses on accessKent may be preliminary or estimated: if you believe your address is incorrect, please notify Kent County Bureau of Equalization at the following e-mail: Jeff.Henrickson@kentcountyml.gov**

### Parcel Identification:

| | |
|---|---|
| Parcel Number: | 41-22-04-378-024 |
| Government Unit Number & Name: | 20 GAINES CHARTER TWP. |
| Parcel Status: | Active |
| Property Address: | 6796 SUMMERBREEZE DR SE |
| Property Classification: | 401 RESIDENTIAL - IMPROVED |
| School District Number & Name: | 41160 - KENTWOOD PUBLIC |
| Zoning: | |
| Acreage & Lot Dimensions: | 0.29: 94X136 |

### Owner Identification:

| | |
|---|---|
| Owner Name One: | BIEREK KURT |
| Owner Name Two: | |
| Mailing Address: | 6796 SUMMERBREEZE DR SE |
| Mailing City, State, Zip Code: | CALEDONIA MI 49316 |

### Assessment

| Year: | State Equalized Value: | Taxable Value: |
|---|---|---|
| 2009 | $100,100 | $100,100 |
| 2008 | $102,600 | $102,600 |
| 2007 | $105,900 | $105,900 |

Delinquent Tax Status    Sales History    Tax Description    Building Char    Split History    Print Reports
Get Map    New Search    Return to Search Results    Refine Search    LOGOUT

$Exh.$ "C"

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

Case No. 8:09-bk-25993-MGW

Chapter 7

IN RE:                                      :
                                            :
Kurt V. Bierek,                             :
                                            :
              Debtor.                       :
                                            :
_____            :

## CONSENT TO MOTION FOR RELIEF FROM STAY

COMES NOW, Kurt V. Bierek, by and through the undersigned attorney and hereby serve(s) notice that there is no objection to the lifting of the automatic stay provided by 11 U.S.C. 362. Kurt V. Bierek, hereby agree(s) to allow FLAGSTAR BANK, FSB, its Successors and/or Assigns, to commence an in rem foreclosure action in the State Court, in order to foreclose its mortgage on the following described real property providing that FLAGSTAR BANK, FSB, its Successors and/or Assigns, shall not seek or obtain an in personam judgment against the Debtor(s):

Township of Gaines, County of Kent and State of Michigan:

Lot 5, The Homes of Summerwind, According To The Recorded Plat Thereof In Liber 103 of Plats on Page 34.

Commonly Known as:

6796 Summerbreeze Drive, Caledonia, Michigan 49316

SIGNED this _____ day of January 2010.

Summer Preston Esquire
Florida Bar No.: _____
Law Offices of Summer Preston, P.A.
2203 N. Lois Avenue, Suite 952
Tampa, FL 33607
(813) 872-9583 (Telephone)

Exh. "D"

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

Case No. 8:09-bk-25993-MGW

Chapter 7

IN RE:                          :
                                :
Kurt V. Bierek,                 :
                                :
          Debtor.               :
                                :

## AGREED ORDER GRANTING FLAGSTAR BANK, FSB'S
## MOTION FOR RELIEF FROM STAY AND ABANDONMENT
## RE: 6796 Summerbreeze Drive, Caledonia, Michigan 49316

THIS CAUSE came on for consideration pursuant to the Agreed Motion By

Flagstar Bank, FSB's Relief From Stay And Abandonment Re: 6796 Summerbreeze

Drive, Caledonia, Michigan 49316, Docket Number _____, filed by FLAGSTAR

BANK, FSB ("FLAGSTAR"), a secured creditor in the above-styled cause. The Court,

having considered said Agreed Motion, is of the opinion that it is appropriate to enter an

Order on such Agreed Motion for Relief from Stay. It is therefore,

ORDERED, ADJUDGED AND DECREED as follows:

1. The Agreed Motion for Relief from the Automatic Stay is granted.

2. The Automatic Stay imposed by 11 U.S.C. § 362 is lifted as to Movant, and it

may proceed with the foreclosure of its lien on the following property:

> Township of Gaines, County of Kent and State of Michigan: Lot 5, The
> Homes of Summerwind, According To The Recorded Plat Thereof In
> Liber 103 of Plats on Page 34.

> Commonly Known as: 6796 Summerbreeze Drive, Caledonia, Michigan
> 49316

*Exh. "E"*

3. This Order is entered for the sole purpose of allowing Movant to obtain an *in rem* judgment against the property described above. Movant shall not seek an *in personam* judgment against Debtor(s).

DATED at Tampa, Florida on

_____
Michael G. Williamson
United States Bankruptcy Judge

Copies furnished to:

Kurt V. Bierek
226 82nd Avenue North
St. Petersburg, FL 33702

Summer Preston
Law Office of Summer Preston, P.A.
2203 N. Lois Avenue, Suite 952
Tampa, FL 33607

Connie J. Delisser, Esquire
The Law Office of Marshall C. Watson, P.A.
1800 Northwest 49th Street, Suite 120
Fort Lauderdale, FL 33309

Fifth Third Bank
P. O. Box 829009
Dallas, TX 75382-9009

HSBC Bank Nevada, N.A.
Bass & Associates, P.C.
3936 E. Ft. Lowell Road, Suite #200
Tucson, AZ 85712

Stephen L. Meininger
707 North Franklin Street, Suite 850
Tampa, FL 33602

FLAGSTAR BANK, FSB

Lawrence M. Weisberg, Esquire
Greenfield & Coomber, P.A.
7000 Palmetto Park Road
Suite #402
Boca Raton, FL 33433

United States Trustee – TPA7
Timberlake Annex, Suite 1200
501 E. Polk Street
Tampa, FL 33602